RECEIVED
USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
ALEXANDRIA, LOUISIANA
DATE 6/6/07
BY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| DEBORAH ANN PARKER<br>on behalf of<br>Kelsey K. Parker<br>   Appellant | CIVIL ACTION<br>NO. 1:06-cv-1054 |
| VERSUS | |
| MICHAEL J. ASTRUE<br>COMMISSIONER OF SOCIAL SECURITY<br>   Appellee | JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE JAMES D. KIRK |

### REPORT AND RECOMMENDATION OF MAGISTRATE JUDGE

Deborah Ann Parker ("Parker"), on behalf of her minor daughter, Kelsey K. Parker ("Kelsey"), seeks judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for Supplemental Security Income ("SSI").

Kelsey was born on March 29, 2000 and is considered a child under the age of eighteen pursuant to 20 C.F.R. §416.924(a). Parker initially filed an application for SSI benefits on behalf of Kelsey on June 7, 2000 and Disability Determination Services ("DDS") awarded benefits July 12, 2000. (R. 13, 39). On November 22, 2004, Parker was notified that Kelsey no longer qualified for SSI and her last SSI payment would be January 2005. (R. 46). Parker filed a Request for Reconsideration of Cessation on November 24, 2004 (R. 47-48), and this request was denied February 7, 2005. (R. 49-59). On February 11, 2005, Parker filed a request for a hearing; accordingly, a hearing was held on February 1, 2006 before

ALJ Michael M. Wahlder. (R. 593-610).

On March 27, 2006, the ALJ issued a decision finding Kelsey was no longer disabled as she had undergone medical improvement. (R. 13). Parker filed a request for review of this decision on March 29, 2006. (R. 8). The Appeals Council denied Parker's request for review, and on April 26, 2006, the ALJ's decision became the final decision of the Commissioner. (R. 5-7).

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. §1381(a). Eligibility is dependent upon disability, income and other financial resources. 42 U.S.C. §1382(a). An individual under the age of eighteen shall be considered disabled if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382(c).

## Summary of Pertinent Facts

Kelsey was born prematurely on March 29, 2000 with a birth weight of 1 pound, 14.5 ounces. (R. 14, 53). Due to her low birth weight, she was found to functionally equal Listing 100.02 of the childhood listing, growth impairment. (R. 14, 39, 162-165). Pursuant to 20 C.F.R. §404.1589, the state re-evaluated Kelsey's disability. It issued a determination November 22, 2004 finding

Kelsey had undergone medical improvement and her asthma did not cause marked and/or severe functional limitations; therefore, her benefits would cease effective January 2005. (R. 43-46).[1] Parker sought reconsideration of the determination, but the Disability Hearing Officer's Decision echoed the prior reasons for cessation of benefits. (R. 53-55). Accordingly, Parker filed a request for an administrative hearing.

From November 2004 through 2005, Kelsey sought treatment on numerous occasions: December 5, 2004 at Natchitoches Parish Hospital ("NPH"), January 3, February 16, 2005 December 23, 2005 at the Shalom Clinic; February 18, March 18, April 29, and November 10, 2005 at Dr. Raghavarao Alla's office; and, March 3 and March 23, and November 10 2005 at Dr. John Van Savage's office.

The December 5, 2004 visit to NPH was due to complaints of fever, congestion and vomiting. (R. 189). No respiratory distress was noted and breath sounds were normal. (R. 190, 191).

The physician's notes from Kelsey's January 3, 2005 visit to the Shalom Clinic indicate that she had a cough and some wheezing (R. 434, 499). Her diagnosis on February 16, 2005 was asthma and viral syndrome. (R. 498). Kelsey was not seen again at the Shalom Clinic until December 23, 2005 when she came in due to fever and

---

[1] At the time of her re-evaluation Kelsey was in the 75th percentile for height and weight (R. 174) and in the twelve months preceding the re-evaluation, Kelsey was seen once at Shalom Clinic for asthma and a cough on July 23, 2004.

vomiting and was diagnosed with viral syndrome. (R. 589).

Kelsey was referred by her treating physician at Shalom Clinic, Dr. Oshikanlu, to Dr. Alla at the Allergy & Asthma Clinic of Central Louisiana for evaluation of her asthma beginning February 18, 2005. (R. 584). Dr. Alla did not note any breathing problems or any treatment for an asthma attack in his notes during that visit. (R. 520). Rather, his notes showed her main complaints were allergies and a rash. Though Dr. Alla noted that she complained of intermittent shortness of breath in the prior two weeks, he stated, "[i]n general she is doing better with fewer episodes of wheezing." He also ordered testing to evaluate recurrent upper respiratory infection and persistent asthma. (R. 513).

Notes from Kelsey's April 29, 2005 visit indicate that this was a follow up visit and that the she was "doing better with no significant difficulty breathing." (R. 529). Dr. Alla provide orders for Kelsey to undergo a liver profile and complete blood count test which she had performed at NPH that day. (R. 580-583). Kelsey was later seen for a follow up visit on July 13, 2005 at which time there were no noted problems. In fact, Dr. Alla stated Kelsey was doing well on the prescribed asthma regimen. (R. 579).

Kelsey was also referred by Dr. Oshikanlu to see Dr. John Van Savage for her urinary frequency problems. Dr. Van Savage saw Kelsey on both March 3 and March 23, 2005. During her first

appointment, Dr. Van Savage determined that Kelsey had a small capacity bladder and problems with urinary frequency and urgency, bed wetting and recurrent urinary tract infections. Accordingly, he placed her on Ditropan, Macrodantin, ordered a workup regarding her urinary tract infections and placed her on a conservative bladder regimen to assist with these problems. (R. 515). At her second appointment, Dr. Van Savage commented: "Kelsey is doing better. She has urinary frequency every two hours and only moderate urinary urgency. She has bed wetting 4 out of 7 nights. She has no side effects with Ditropan. She is a deep sleeper. She has no nocturia." He further noted a good response to the medication as far as Kelsey's urinary frequency and urgency and bed wetting were concerned and called for a follow up visit in three months. (R. 511). A follow up visit was held November 10, 2005 in which Dr. Van Savage noted that Parker was pleased with Kelsey's progress with respect to her bed wetting issues. (R. 591).

At the hearing held on February 1, 2006. Both Parker and Kelsey testified. When asked about herself, Kelsey advised that she was five years old, attended Weaver Elementary School and liked to play basketball. (R. 596-597). Parker spoke about Kelsey being a premature infant and opined that because Kelsey was on oxygen for three months as a newborn she had always had breathing problems. (R. 600). Parker advised that Kelsey stayed sick, and she saw Dr. Alla regularly for evaluation. In addition to being asthmatic,

-5-

Kelsey also suffered from bladder problems. Specifically, she had a small bladder which caused her to need to use the restroom frequently and wet the bed at night. (R. 602). Parker also advised that Kelsey used a nebulizer four times a day for asthma and took thirty five (35) medications a day to control her asthma, bladder problems, allergies, headaches and various other problems.[2] (R. 597-599).

## Standard of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether there were any prejudicial legal errors. Crouchet v. Sullivan, 885 F.2d 202,204 (5th Cir. 1989). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision, but must include a

---

[2] Parker stated during the hearing and reiterated in her briefs to this Court that Kelsey takes 35 medications a day. However, she acknowledged during the hearing (R. 600) and on the medications list (R. 156) that many of these medications are taken on an as needed basis.

scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1086).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v. Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992).

## Issues

Parker raises the following issues for appellate review:

1. Whether the Commissioner failed to find that Kelsey K. Parker suffers from a listed impairment or a combination of impairments which meets or medically or functionally equal a listing;

2. Whether the Commissioner misrepresented the medical evidence in the records including but not limited to the extent of treatment and the report of the consultative examiner;

3. The Commissioner erred by failing to request the presence of a medical expert at the hearing.


**Whether the Commissioner failed to find that Kelsey K. Parker suffers from a listed impairment of a combination of impairments which meets or medically or functionally equals a listing**

Under the three-step evaluation process for determining whether a child is disabled, the ALJ has to determine (1) whether

the child was engaging in substantial gainful activity; (2) if not, whether the child has a severe impairment; and (3) if so, whether the child had an impairment which met or equaled the severity of a listed impairment. See Harris v. Apfel, 209 F.3d 413, 417-418 (5th Cir. 2000). If a severe impairment is found, then it must meet the duration requirement to determine if the claimant is disabled. 20 C.F.R. §416.924. If a child's impairments do not meet a listed impairment, a functional limitation assessment is done to determine whether functional limitations are disabling. 20 C.F.R. §416.926a.

In order to be functionally equivalent to a listing level severity, an impairment must result in "marked" limitation in at least two domains of functioning, or an "extreme" limitation in one domain. 20 C.F.R. §416.926a(d). The domains include acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; caring for yourself; and health and physical well-being. 20 C.F.R. §416.926a(b)(1).

The ALJ found that on March 29, 2000, Kelsey was determined to be disabled due to prematurity at birth. He further found that though Kelsey had severe asthma, urinary frequency and urgency and allergies, she was suffering from less than marked impairments in the area of health and well-being and performed age appropriate activities. Accordingly, he determined that Kelsey's disability medically improved since the comparison point decision of July 12,

2000; her impairment or combination of impairments did not meet or equal the severity of an impairment listed in Appendix I, Subpart P, Regulation No. 4; and, her disability benefits properly ceased in November 2004. (R. 18).

Parker claims that Kelsey meets or equals the requirements for disability pursuant to section 103.02E and 103.03 of the listing of impairments due to chronic pulmonary insufficiency and asthma. (Doc. Item 8). Parker bears the burden of proving that Kelsey meets these listings.

### Bronchopulmonary Dysplasia

To meet the requirements of section 103.02E, Kelsey would have to show that she had Bronchopulmonary Dysplasia (BPD) characterized by two of the following: (1) prolonged expirations; (2) intermittent wheezing or increased respiratory effort as evidenced by retractions, flaring and tachypnea; (3) hyperinflation and scarring on a chest radiograph or other appropriate imaging techniques; (4) bronchiodialator or diuretic dependency; (5) a frequent requirement for nocturnal supplemental oxygen; (6) weight disturbance with either an involuntary weight loss (or failure to gain weight at a rate appropriate for age) resulting in a fall of 15 percentiles from established growth curve (on standard growth charts) which persists for 2 months or longer, or an involuntary weight loss (or failure to gain weight at a rate appropriate for age) resulting in a fall to below the third percentile from

established growth curve (on standard growth charts) which persists for 2 months or longer. Parker contends that Kelsey meets items two (2) and four (4) of this listing.

In support of her claim that Kelsey meets the BPD listing, Parker cites the diagnosis by Dr. Michael Manuel, the consultative examiner used during the time of Kelsey's re-evaluation. (R. 174-175). In that report, Dr. Manuel states, "[i]t is apparent to me from the extended hospital stay as a newborn that this child has bronchopulmonary dysplasia." Dr. Manuel opined that he considered Kelsey to be permanently disabled by the BPD as he considered the BPD to be "much more significant and severe than one would normally expect". (R. 175).

The ALJ rejected Dr. Manuel's statements regarding permanent disability due to BPD as conclusory and not supported by the evidence. (R. 14). Dr. B.D. McKeller who completed the Childhood Disability Evaluation Form in November of 2004, also noted Dr. Manuel's conclusion was not supported by the medical evidence in Kelsey's file. Though BPD can be diagnosed in premature infants who are fourteen to thirty days old, a review of the record (which contains numerous treatment notes from treating physicians, hospitals and clinics over the course of Kelsey's life) shows only one mention of BPD, and that is in Dr. Manuel's report. MEDLINEplus Health Information, Medical Encyclopedia: *Bronchopulmonary Dysplasia*, available at: http://www.nhlbi.nih.

gov/health/dci/Diseases/Bpd/Bpd_WhatIs.html (a service of the U.S. National Library of Medicine and the National Institutes of Health). Dr. Manuel noted that he obtained his information from Parker and that he ordered x-rays of Kelsey's chest during this consultation, but there is no evidence that Dr. Manuel ran other medical tests, such as blood tests and echocardiograms to confirm his diagnosis of BPD. Id. Furthermore, he failed to refer to any outside medical evidence, such as records LSU Health & Sciences Center, Shreveport where Kelsey was cared for as a premature infant.[3]

A single diagnosis of BPD by a physician who did not see Kelsey on more than one occasion and did not have the benefit of prior medical records is not a credible diagnosis. Thus, Kelsey does not meet Listing 103.02E.

### Asthma

Parker also contends that Kelsey meets the Asthma listing set forth in section 103.03B. In order to meet the requirements of section 103.03B of the listing, Kelsey would have to show that she had asthma attacks as described in section 3.00C, *infra*, in spite of prescribed treatment and requiring physician intervention at least once every two months or six times a year, with an evaluation period of at least 12 consecutive months to determine frequency of

---

[3] The record contains only two pieces of paper from LSU Health & Sciences Center, Shreveport regarding Kelsey, and those records simply confirm Kelsey was born prematurely on March 29, 2000. (R. 160-161).

attacks. Listing 103.03 refers to asthma "attacks" as defined in 3.00C, which provides:

> *Episodic respiratory disease.* When a respiratory impairment is episodic in nature, as can occur with exacerbations of asthma, cystic fibrosis, brochiectasis, or chronic asthmatic bronchitis, the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment. Documentation for these exacerbations should include available hospital, emergency facility and/or physician records indicating the dates of treatment; clinical and laboratory findings on presentation, such as the results of spirometry and arterial blood gas studies (ABGS); the treatment administered ; the time period required for treatment; and the clinical response. Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum), or respiratory failure as referred to in paragraph B of 3.03, 3.04 and 3.07, are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalation bronchodilator therapy in a hospital, emergency inpatient hospitalization for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regiment of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between the attacks that document the presence of baseline airflow obstruction.
> 20 C.F.R. pt. 404, subpt. P, app. 1, §3.00C.

Kelsey contends that she meets the listing because she was frequently seen by doctors due to her breathing problems and, specifically, was seen at least six times by doctors in 2005. However, doctors visits do not in and of themselves establish that Kelsey met the requirements of 103.03B. Kelsey would have had to experience attacks which required physician intervention, but there is no evidence she was ever in distress when she saw either Dr.

Alla or Dr. Oshikanlu. There is no medical evidence from 2005 showing she had asthmatic episodes lasting one or more days; required extensive treatment; or, required hospitalization. While Kelsey did see Dr. Alla approximately once a month, these visits were to evaluate Kelsey's asthma, not treat her for what is defined in Section 3.00(c) as an asthma attack. Thus, the ALJ determined that Kelsey did not meet or equal in severity any impairment shown in Appendix 1, Subpart P, Regulations No. 4. (R. 18).

### Functional Equivalency

As for claims that Kelsey is functionally equivalent to a listing level severity, the ALJ stated that there was no evidence in the record of impairment in the domains of "acquiring and using information," "attending and completing tasks," "interacting and relating with others," "moving about and manipulating objects," "caring for yourself," and "health and physical well-being". He further found that Kelsey suffered from a less than marked impairment in the area of "health and physical well-being". Nonetheless, Parker claims that Kelsey has an extreme limitation in the domain of "health and physical well-being" as she has trouble breathing due to BPD and asthma, suffers from urinary frequency and urgency and has chronic ear infections. As stated above, there is no reliable medical evidence that Kelsey has BPD, no medical evidence that Kelsey's breathing was compromised at the time of her 2005 physicians visits, no hospitalizations during that time, and

only one asthmatic episode during 2004 required physician intervention. Additionally, the ALJ determined that Kelsey's growth and development were normal for her age and she suffers from a less than marked impairment in the area of health and physical well-being because her problems are improving with time and current treatment. (R. 17).

Accordingly, there is substantial evidence in the record to support the conclusion that Kelsey does not meet the requirements of a listed impairment or combination thereof that medically or functionally equal a listed impairment.

**Whether the Commissioner misrepresented the medical evidence in the record including but not limited to the extent of treatment and the report of the consultative examiner.**

Parker contends the ALJ erroneously found Dr. Manuel's statement regarding Kelsey being permanently disabled due to BPD to be a conclusory opinion which was unsupported by the record. As addressed previously, there is substantial evidence to support the ALJ's determination. The ALJ has the ultimate responsibility in determining whether or not a claimant is disabled. 20 C.F.R. §404.1527(d)(2). Simply because a physician states one is disabled does not make it so. Further, an ALJ may reject a physicians opinion if there is good cause to do so. Good cause includes brief and conclusory statement, those not supported by medically acceptable clinical laboratory diagnostic techniques and/or otherwise unsupported by the evidence. Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000); Brown v. Apfel, 192 F.3d 492, 500 (5th Cir.

1999); Greenspan v. Shalala, 38 F.3d 232, 237 (5th Cir. 1994); Scott v. Heckler, 770 F.2d 482, 485 (5th Cir. 1985). Here, the ALJ determined that the statement was both conclusory and unsupported by the evidence and his finding is supported by substantial evidence.

**The Commissioner erred by failed to request the presence of a medical expert at the hearing.**

Parker suggests that though the decision to solicit the opinion of a medical expert "is totally within an ALJ's discretion" the ALJ should have done so in this case to help explain the medical evidence in the record. (Doc. Item 8, p.8). Parker is correct in stating that the ultimate decision is entirely within the ALJ's discretion. 20 C.F.R. §416.927(f)(2)(iii). It was not necessary for a medical expert to testify at the hearing. The record contains medical records from Natchitoches Parish Hospital, Shalom Clinic for Children, the Allergy and Asthma Center of Central Louisiana and notes from physicians at those facilities as well as records from Drs. Badeaux and Van Savage. These sources provide sufficient information regarding Kelsey's health, and the ALJ relied upon those records in making his determination.

Therefore, there is substantial evidence in the record to support the Commissioner' decision and the decision is consistent with relevant legal standards.

## Conclusion

For the reasons set forth herein, I find that there is

substantial evidence in the record to support the Commissioner's decision, and that the decision is consistent with relevant legal standards. Based on the foregoing discussion, IT IS RECOMMENDED that Parker's appeal be DENIED and DISMISSED WITH PREJUDICE.

### Objections

Under the provisions of 28 U.S.C. §636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond too another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING AN APPEAL ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 6th day of June, 2007.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE